**SIGNED THIS: March 29, 2018**

_____

**Mary P. Gorman**
**United States Chief Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | |
| | ) | Case No. 14-71512 |
| Kent Eugene DeLay, | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| Ryan Bandy, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 16-07040 |
| | ) | |
| Kent E. DeLay, Randall Stieren, | ) | |
| David Reid, and | ) | |
| Mariann Pogge, Chapter 7 Trustee | ) | |
| | ) | |
| Defendants. | ) | |

# O P I N I O N

Before the Court is the second amended complaint filed by Ryan Bandy, wherein he seeks both compensatory and punitive damages for a willful stay violation by the Debtor, Kent DeLay, and his attorney and requests avoidance of a summary judgment entered against Mr. Bandy and in favor of Mr. DeLay by the state court after Mr. DeLay filed his bankruptcy. Because Mr. Bandy has met his burden of proof on most of the issues presented at trial, judgment will be entered in his favor, and the relief he seeks will be awarded, in part.

## I. Factual and Procedural Background

Kent Eugene DeLay filed his voluntary petition under Chapter 7 on August 20, 2014. On his Statement of Financial Affairs, Mr. DeLay listed a pending legal action brought against him by Ryan Bandy and a pending counterclaim brought by him against Mr. Bandy. On his Schedule B – Personal Property, Mr. DeLay listed the possible recovery from his counterclaim as an asset. On his Schedule F – Creditors Holding Unsecured Nonpriority Claims, Mr. DeLay listed Mr. Bandy as a creditor but gave Mr. Bandy's address as that of Attorney David Reid—Mr. DeLay's own attorney in the pending state court litigation.

Mariann Pogge was appointed the Chapter 7 trustee ("Trustee") in Mr. DeLay's case; she conducted creditors meetings with Mr. DeLay on October 20, 2014, and November 3, 2014. In the absence of any objection, Mr. DeLay received his discharge on December 24, 2014.

Little activity occurred in the case for almost two years, but the Trustee did file interim United States Trustee ("UST") reports for the periods ending December 31, 2014, and December 31, 2015. In her reports, the Trustee stated that Mr.

DeLay had a pending counterclaim against a former investor, that she was waiting for the claims bar date to expire before determining whether to pursue the action, and that she was awaiting the outcome of pending motions for summary judgment in the state court. On August 16, 2016, the Trustee filed a motion to compromise controversy stating that Mr. DeLay had prevailed in the state court litigation and asking for authority to compromise the estate's interest in Mr. DeLay's "Counterclaim and any rights flowing to Debtor from the Counterclaim" with Mr. DeLay for $15,000. The Trustee sent notice of her motion to compromise to all creditors and parties in interest, setting September 12, 2016, as the last date to file objections to the motion. The Trustee's certificate of service for her motion and objection date notice show that the Trustee served Mr. Bandy at the office of Mr. DeLay's attorney, David Reid.

On September 12, 2016, Attorney Kevin Linder entered his appearance in the bankruptcy case on behalf of Mr. Bandy and filed a motion requesting that Mr. DeLay's discharge be revoked and that the state court judgment be voided. The motion alleged that Mr. DeLay's Schedule F did not properly list all creditors and that he fraudulently concealed his bankruptcy from Mr. Bandy by sending Mr. Bandy's notices to Attorney Reid. In addition, Attorney Linder filed an objection to the Trustee's motion to compromise controversy.

On September 13, 2016, Mr. Bandy filed an adversary complaint requesting that Mr. DeLay's discharge be revoked and that the state court judgment be voided. Mr. DeLay moved to dismiss the complaint, asserting that the statute of limitations had run on the action to revoke his discharge. The motion to dismiss was granted, but Mr. Bandy was given leave to amend. Mr. Bandy filed an

amended complaint on December 29, 2016, adding Attorney Reid as an additional defendant. Upon subsequent motion by Mr. Reid, the amended complaint was also dismissed, but Mr. Bandy was again granted leave to amend.

A five-count second amended complaint ("Adversary Complaint") was filed on May 9, 2017, against Mr. DeLay, Attorney Reid, the Trustee, and Randall Stieren. Count I alleged that Mr. DeLay had violated the automatic stay by continuing the state court litigation after the bankruptcy filing and sought sanctions for his conduct. Count II requested a declaratory judgment that the state court judgment was void due to being obtained in violation of the automatic stay. Count III requested a declaratory judgment finding that the Trustee's motion to compromise controversy was void and requesting the Court to provide direction to the Trustee on how to deal with the sale of Mr. DeLay's property. Count IV requested sanctions against Mr. Reid for violation of the automatic stay and violation of the Illinois Rules of Professional Conduct by concealing the bankruptcy from Mr. Bandy, Mr. Bandy's attorney, and the state court. Count V sought punitive damages from Mr. Reid for his alleged willful and deliberate violation of the automatic stay.

On a motion filed by the Trustee, Count III was dismissed for failure to state a cause of action upon which relief could be granted, and Mr. Bandy was denied leave to amend the dismissed count. Also on her motion, the Trustee was granted leave to intervene as a defendant in Count II. The Trustee, Mr. Reid, Mr. DeLay, and Mr. Stieren (collectively "Defendants") all filed answers and affirmative defenses to the Adversary Complaint. The affirmative defenses generally assert that the continued prosecution of the state court litigation by Mr. DeLay and Mr.

Reid after the bankruptcy filing did not violate the automatic stay and that, because Mr. Bandy is not a creditor of Mr. DeLay, he has no standing to enforce the stay.

At a hearing held on the Trustee's motion to compromise controversy with Mr. DeLay, the Trustee admitted that she had told Mr. Reid to go ahead with the state court action and to let her know the result. She acknowledged that she did not think about the automatic stay issues when she told Mr. Reid he could proceed. The Court expressed concern that the stay had been violated and that Mr. Bandy had never received notice of the case filing. The Court questioned why Mr. Reid had continued to receive notices for Mr. Bandy—an adverse party in the state court litigation—and had not rectified the situation by notifying Mr. Bandy or his state court attorney about the bankruptcy filing. The motion to compromise was continued generally pending resolution of the issues raised by Mr. Bandy through this adversary proceeding.

The Adversary Complaint was tried on December 19 and 20, 2017. At the commencement of the trial, the parties submitted stipulated exhibits consisting of the docket, pleadings, motions, and other filings from the state court litigation. The parties agreed that all of the exhibits would be admitted without further foundation to provide a record of what had occurred in state court.

Based on the stipulated exhibits, it appears Mr. Bandy filed his Complaint for Declaratory Judgment against Mr. DeLay and Mr. Stieren ("State Court Complaint") in Sangamon County Circuit Court on October 11, 2013. The State Court Complaint was based on a Purchase Agreement and related documents that Mr. Bandy executed along with Mr. DeLay and Mr. Stieren related to their joint

ownership of RKR Clubs, LLC ("RKR Clubs"). The Purchase Agreement dated October 18, 2010, recited that, with respect to their membership interests in RKR Clubs, Mr. DeLay owned 36%, Mr. Stieren owned 34%, and Mr. Bandy owned 30%. Pursuant to the Purchase Agreement, Mr. Bandy acquired the interests of both Mr. DeLay and Mr. Stieren in exchange for executing a $20,000 promissory note to them. Mr. DeLay and Mr. Stieren retained an option under the Purchase Agreement to reacquire their membership interests under certain conditions and by forgiving any remaining amounts due on the promissory note. According to the State Court Complaint, a further agreement was entered into on February 11, 2011, by Mr. Bandy, Mr. DeLay, and Mr. Stieren, whereby Mr. Bandy assumed an $8000 obligation owed by Mr. DeLay and Mr. Stieren to James Kuizin. The assumption agreement provided that Mr. Bandy could deduct the amount of any payments he made to Mr. Kuizin from the $20,000 he owed to Mr. DeLay and Mr. Stieren, but, if Mr. DeLay and Mr. Stieren exercised their option to reacquire their membership interests in RKR Clubs, they would have to reimburse Mr. Bandy for all payments he had made to Mr. Kuizin.

In the State Court Complaint, Mr. Bandy asserted that he had fully complied with his obligations under the Purchase Agreement, that the time for Mr. DeLay and Mr. Stieren to exercise their option to reacquire their membership interests had expired, and that he was entitled to a declaratory judgment finding him to be the sole owner of RKR Clubs. Mr. Bandy also asked the state court to fix the amount remaining due from him to Mr. DeLay and Mr. Stieren after giving credit for his payments to Mr. Kuizin. Mr. DeLay and Mr. Stieren answered the State Court Complaint by asserting that they had timely exercised their rights to

reacquire their interests in RKR Clubs and that Mr. Bandy had breached the Purchase Agreement by refusing to allow them to exercise their option rights. In addition to answering the complaint and raising several affirmative defenses, Mr. DeLay and Mr. Stieren filed a counterclaim against Mr. Bandy, seeking a declaratory judgment that they had properly exercised their option to repurchase their interests in RKR Clubs and that Mr. Bandy was obligated to turn over their interests in RKR Clubs to them. They also asked the state court to determine the amount due from them to Mr. Bandy under the Purchase Agreement.

The state court record reflects the filing of numerous motions and discovery requests. Ultimately, cross motions for summary judgment were filed and briefed. After a series of responses, objections, and supplementary filings, the state court granted summary judgment in favor of Mr. DeLay and Mr. Stieren on March 23, 2015. The court ordered Mr. Bandy to transfer to Mr. DeLay and Mr. Stieren their ownership interests in RKR Clubs in shares proportionate to the amount of indebtedness to be forgiven. Mr. DeLay and Mr. Stieren were ordered to reimburse Mr. Bandy for any payments made by him on the debt to Mr. Kuizin.

Mr. Bandy filed an appeal with the Fourth District Appellate Court of Illinois. On July 26, 2016, the appellate court affirmed the judgment and remanded the matter for further proceedings. On August 19, 2016, Mr. DeLay and Mr. Stieren filed a motion to compel seeking to enforce the summary judgment and also requesting an accounting and other relief from Mr. Bandy. By that time, however, Mr. Bandy had learned of Mr. DeLay's bankruptcy, and he filed a response to the motion to compel arguing that Mr. DeLay lost his standing to litigate in state court when he filed bankruptcy. Mr. Bandy also filed a motion to

void the summary judgment arguing that the judgment had been entered in violation of the automatic stay. Since learning of the pending bankruptcy, the state court has entered no further orders and, apparently, awaits resolution of the issues here.

In addition to the state court record, other exhibits were admitted at the trial, and the parties and other witnesses testified. Mr. DeLay was the first to testify, called as an adverse witness by Mr. Bandy. Mr. DeLay stated that he filed his bankruptcy in 2014 and was represented by Attorney Thomas Carlisle and the firm of Ostling & Associates ("Ostling"). Prior to filing, he filled out worksheets used by Ostling staff to create his bankruptcy documents. He later met with Attorney Carlisle and briefly reviewed the documents before signing and initialing them. He identified the page from his schedules whereon he listed Mr. Bandy's address as "c/o David Reid" and admitted that he initialed that page indicating its accuracy during his meeting with Attorney Carlisle.

Mr. DeLay testified that he first became aware that Mr. Reid was receiving the bankruptcy notices on behalf of Mr. Bandy when Mr. Reid's assistant, Andrea Shaughnessy, called him and notified him about the issue and requested that he contact Ostling to have Mr. Bandy's address corrected. He said that he called Ostling twice and that he spoke both times with Ostling employee, Justine Guthrie, about the notice problem. Mr. DeLay said that he also visited Ostling's Springfield office in person to deal with the notice issue. He acknowledged that the only result of his meeting at the Ostling office was an email sent by Justine Guthrie to Mr. Reid assuring him that Mr. DeLay intended to pay any attorney fees due to Mr. Reid notwithstanding the bankruptcy.

Mr. DeLay identified a letter sent by Mr. Reid on August 28, 2014, to him and Mr. Stieren. In the letter, Mr. Reid expressed concern about Mr. DeLay's bankruptcy filing and stated his intent to withdraw from representing Mr. DeLay and Mr. Stieren in the state court case because the bankruptcy, in Mr. Reid's words, "greatly affects our case and my representation of you." Mr. DeLay also identified a receipt dated September 16, 2014, evidencing that Mr. Stieren had paid Mr. Reid an additional $10,000 in fees on that date. He said that, ultimately, Mr. Reid did not withdraw from the state court case.

Mr. DeLay acknowledged that the August 28th letter from Mr. Reid made reference to a request to produce that had been served by Mr. Bandy's attorney and for which a response was due by September 29, 2014. He identified the response drafted by Mr. Reid and signed under oath by him and Mr. Stieren on October 15, 2014. He acknowledged that Request No. 15 of the document asked for "[c]opies of all pleadings for all actions in which either or both of the Defendants is a party[.]" He admitted that he and Mr. Stieren responded by objecting to Request No. 15 as not relevant and also affirmatively answering that information about any such actions could be found at the Sangamon County Courthouse.

Mr. DeLay also identified an email he sent to Mr. Reid dated September 3, 2014. In that email he proposed an offer of settlement that he wanted Mr. Reid to make to Mr. Bandy's attorney and, in referring to Mr. Bandy and the continuing litigation, said "[h]e doesn't need to know it may be done by a Trustee appointed attorney at this point." The email also said that, if the settlement was accepted, Mr. DeLay would waive his interest in the settlement funds and directed that, after

payment of Mr. Reid's fees, all other proceeds should go to Mr. Stieren.

With respect to the note to Mr. Kuizin, Mr. DeLay admitted that, pursuant to the state court order, he was to pay $8000 to Mr. Bandy as reimbursement. He qualified his answer, however, by noting that the payment to Mr. Bandy did not have to be made until he reacquired his interest in RKR Clubs from Mr. Bandy.

Under examination by his own attorney, Mr. DeLay clarified that the $10,000 paid to Mr. Reid on September 16, 2014, came from the proceeds of a loan obtained by Mr. Stieren. He also stated that the only person he ever dealt with at Ostling, other than Attorney Carlisle, was Justine Guthrie.

During questioning by Mr. Reid's attorney, Mr. DeLay further clarified that neither he nor Mr. Stieren had the funds to pay fees to Mr. Reid in September 2014. Mr. Stieren, however, was able to obtain two loans totaling $10,000 to pay Mr. Reid. Mr. DeLay said he had nothing to do with the funds used to pay Mr. Reid. Mr. DeLay also said that he only learned of the mistake concerning Mr. Bandy's address on his bankruptcy schedules when he was called by Mr. Reid's assistant. He said that he tried to fix the mistake by contacting Ostling.

On redirect examination by Mr. Bandy's attorney, Mr. DeLay asserted that he thought the problem with Mr. Bandy's address had been fixed after he visited Ostling's Springfield office. He also said, however, that he had been told at Ostling's office that the address issue did not matter because Mr. Bandy was "not a creditor anyway." When asked why he listed Mr. Bandy on his schedules, he claimed that he had not listed Mr Bandy; Ostling was responsible for the listing.

Ryan Bandy testified on his own behalf. He explained that RKR Clubs operates the Station House bar in Springfield. Station House was previously

owned and operated through a corporation in which Mr. DeLay and Mr. Stieren were shareholders. The bar had closed, reopened, and then closed again during 2009 and 2010. Mr. Bandy was friends with Mr. DeLay and Mr. Stieren, and, in August 2010, they created RKR Clubs and began their joint operation of the bar. Mr. Bandy made a $6000 investment in the operation, and Mr. DeLay and Mr. Stieren agreed to make a combined $14,000 investment. But Mr. DeLay and Mr. Stieren only contributed $8000, which they borrowed from James Kuizin. Mr. Bandy identified the original note executed by Mr. DeLay and Mr. Stieren to Mr. Kuizin and acknowledged that he had assumed and paid the note in full after signing the Purchase Agreement.

Mr. Bandy testified that the bar occupies leased premises that he now owns through his company, Bando Properties, LLC. He purchased the building from the prior landlord using his own personal funds for the down payment. RKR Clubs pays $3700 per month in rent. The bar business grossed about $350,000 last year. After paying himself a salary of around $45,000 and covering all other expenses of the operation, only several thousand dollars in profit was recognized.

Mr. Bandy testified that he first learned of Mr. DeLay's bankruptcy shortly after the appellate court ruled against him. He talked with his attorney, David Hall, about how to proceed, and they decided to end the litigation and turn over the bar to Mr. DeLay and Mr. Stieren. Attorney Hall sent a letter to Mr. Reid on July 27, 2016, to begin that process, and Mr. Bandy began to inform his employees and patrons of the upcoming change. During just such a conversation, a bar patron, Tracy Woodard, asked how someone who had filed bankruptcy could take over the bar. She told Mr. Bandy that she had filed bankruptcy herself and

had seen Mr. DeLay at a bankruptcy hearing. Mr. Bandy then called Attorney Hall to alert him to the bankruptcy filing. Mr. Bandy said that, prior to hearing from Ms. Woodard, he never received any notice of the bankruptcy from Mr. DeLay or Mr. Reid. He also testified that Mr. Reid replied to Mr. Hall, rejecting Mr. Bandy's offer to promptly turn over the bar and stating the intent of Mr. DeLay and Mr. Stieren to continue the litigation.

After learning of the bankruptcy, Mr. Bandy made an offer to purchase Mr. DeLay's interest in RKR Clubs from the Trustee. He said he was never contacted by the Trustee to look at the bar or to evaluate the business. He also testified that, during the course of the state court litigation, he had paid Attorney Hall between $20,000 and $30,000 in fees and that he had paid the bankruptcy attorney representing him in this proceeding, Kevin Linder, approximately $27,000.

Under examination by Mr. DeLay's attorney, Mr. Bandy reiterated that he had used his personal funds and not the profits of RKR Clubs to purchase the building occupied by the bar. He also confirmed that Mr. DeLay and Mr. Stieren had been kept out of the bar for some period of time and were essentially banned from entry. Mr. Bandy said that it was not fair to put employees in the middle of their dispute. He also said that Mr. DeLay's son had sued him and his business, alleging assault. He stated that Mr. DeLay and Mr. Stieren were given access to remove their personal property from the bar.

Mr. Reid's attorney also examined Mr. Bandy. He again clarified that, through a separate limited liability company, he is the landlord for RKR Clubs. And he repeated that Mr. DeLay and Mr. Stieren had been barred from entry into the bar since 2011. He acknowledged that he had been exercising full control over

the business.

Called as a witness by Mr. Bandy, the Trustee testified about her role in Mr. DeLay's case. She stated that she had served as a panel Chapter 7 trustee for approximately 30 years. She conducted Mr. DeLay's initial creditors meeting on October 20, 2014, but, despite being sure that she had turned on the recording device, she acknowledged that no audio record of the meeting exists. She stated that she had no independent recollection of the creditors meeting, but her notes show that she circled Mr. DeLay's reference to his pending counterclaim lawsuit, and she was sure she made an inquiry about the lawsuit at the meeting. She also recalled speaking with Attorney Reid after the meeting and asking him about the lawsuit. She said that she did not receive or review copies of all pleadings from the state court case. She thought the case had minimal value, but Mr. Reid told her that Mr. DeLay and Mr. Stieren were seeking damages that could be significant. Mr. Reid updated her from time to time about the case, and she filed periodic reports as required by the UST, indicating that she was awaiting the outcome of the state court litigation. She never hired Mr. Reid to represent the interests of the bankruptcy estate in the state court litigation.

The Trustee acknowledged that, on August 16, 2016, she filed a motion to compromise seeking authority to accept $15,000 from Mr. DeLay for his rights as set forth in his counterclaim and the state court order entering judgment in his favor. Before filing that motion, she received a call from Attorney Hall who told her that Mr. Bandy had never received notice of the bankruptcy filing. She said that she was "flabbergasted" to hear that information from Attorney Hall but, when she investigated, learned he was correct. She identified documents she had sent to

-13-

Ostling previously in the case requesting that incorrect addresses of creditors be fixed but admitted that she did not send the same type of notice to Ostling when she learned of the problem with Mr. Bandy's address. She also admitted that she took no action to notify the Clerk of Court of the problem or to correct the address herself. She did, however, send notice of the motion to compromise to Attorney Hall, believing that notice was sufficient.

The Trustee also testified that she received a $10,000 offer from Attorney Hall on behalf of Mr. Bandy to purchase Mr. DeLay's rights as set forth in the counterclaim. Because over $9000 in claims had been filed, that offer was not enough to pay all claims in full, so she called Mr. Reid who subsequently offered $15,000 on behalf of Mr. DeLay. The Trustee said that the $15,000 has been paid and is in her trust account; it was paid by cashier's check, but she had no recollection of any other details about the check.

Under examination by Mr. Reid's attorney, the Trustee admitted that she never told Mr. Reid and Mr. DeLay that they could not proceed with the state court litigation. To the contrary, she stated that she believed that she had authorized them to proceed. She said that she did not think the case was worth much and did not want to hire Mr. Reid on an hourly basis when she had no funds to pay him. She disagreed, however, with Mr. Reid's attorney's suggestion that telling a debtor to go ahead and prosecute litigation while a trustee keeps a case open and waits to see what happens is common trustee practice. She said that she had never seen a case like this before. Generally, cases with pending litigation involve personal injury claims for which she can hire an attorney on a contingency basis and thus avoid the possibility of incurring fees without also

recovering funds to pay those fees. She also testified that, although she has objected to the claim filed by Mr. Bandy, her objection is based on the fact that most of his claim is for postpetition matters; she has made no objection that his claim was time barred.

Attorney Hall was also called as a witness by Mr. Bandy. He testified that he filed suit on behalf of Mr. Bandy and against Mr. DeLay and Mr. Stieren in state court in October 2013. The purpose of the lawsuit was to get a determination of the amounts Mr. Bandy owed to Mr. DeLay and Mr. Stieren to  complete the Purchase Agreement. He explained that the counterclaim filed by Mr. DeLay and Mr. Stieren sought to have ownership of RKR Clubs restored to them and also requested damages from Mr. Bandy.

Attorney Hall identified the response he received to a request to produce that he served on Mr. Reid to obtain discovery from Mr. DeLay and Mr. Stieren. In particular, he noted their response to Request No. 15 in which he had asked for information regarding any "actions" to which either Mr. DeLay or Mr. Stieren were parties. He said that their response to Request No. 15 was a lie because, in addition to saying the information was irrelevant, they said that all responsive information could be found in the records at the Sangamon County Courthouse. He stated that bankruptcy records are not available at that location. Mr. Hall also said that Mr. Reid never told him about Mr. DeLay's bankruptcy and that they were in court together multiple times after the bankruptcy filing when the information could have been disclosed to him and to the state court. Mr. Reid also never delivered the notices he had received for Mr. Bandy.

Mr. Bandy notified Attorney Hall of Mr. DeLay's bankruptcy after he heard

about it from a customer in late July 2016. Attorney Hall said that his initial reaction upon hearing the news of the bankruptcy was that Mr. Reid would be upset to learn of the bankruptcy also. But, after checking online records regarding the bankruptcy, he found that Mr. Reid had known about the bankruptcy all along and had been receiving the notices intended for Mr. Bandy without turning those notices over to Mr. Bandy. Attorney Hall said that he contacted the Trustee and told her of the notice problem. She responded that it was not her job to make sure that a debtor's mailing matrix was correct. She also told him that, if Mr. Bandy was interested, he could make an offer to her to purchase Mr. DeLay's interest in the business. Attorney Hall subsequently emailed Mr. Bandy's offer to purchase to the Trustee.

After learning of the bankruptcy, Attorney Hall also filed a motion to supplement the record in the appellate court, but that motion was not ruled on before the mandate was issued to the trial court. Also before the mandate issued, Mr. Reid filed a motion to compel in the trial court. The motion sought turnover of Mr. DeLay's and Mr. Stieren's interests in RKR Clubs and additional money damages, but it made no mention of the Trustee's interest in those assets. Mr. Bandy responded to the motion to compel, in part, by notifying the trial court of Mr. DeLay's bankruptcy filing.

On cross-examination, Attorney Hall was asked by Mr. Reid's attorney if it was his position that Mr. DeLay's bankruptcy had been intentionally concealed. He responded: "that's the way it looks." He also was asked if he believed that the bankruptcy should have been disclosed in Mr. DeLay's and Mr. Stieren's response to the request to produce. He said that the bankruptcy should have been

identified in the response. In an ill-considered attempt at impeachment, Mr. Reid's attorney asked Attorney Hall about an answer he gave to a deposition question where he was asked about what he was looking for in the request to produce, to which he said he was looking for information about "litigation." In the deposition testimony cited by Mr. Reid's attorney, Attorney Hall qualified his answer by saying that he would need to see the written request to produce to answer the question specifically and stated only generally what he recalled he had requested. After this Court ruled that the difference in terms was not impeaching, Mr. Reid's attorney dropped the line of questioning.

Tracy Woodard testified on behalf of Mr. Bandy. She said that she was a patron of the bar operated by Mr. Bandy and also knew Mr. DeLay from his prior association with the bar. Although vague on her timeline and dates, Ms. Woodard said that she had filed bankruptcy herself and had seen Mr. DeLay at the meeting where she had met the Trustee. Sometime later, when she was at the bar, she heard Mr. Bandy telling patrons that he had lost the lawsuit and was turning the bar over to Mr. DeLay and Mr. Stieren. She testified that she then told Mr. Bandy that Mr. DeLay had filed bankruptcy, and Mr. Bandy seemed surprised to hear that news.

Attorney David Reid was called as a witness by Mr. Bandy. He testified that he had some knowledge of bankruptcy from his previous employment in the Office of Chief Counsel of the Internal Revenue Service. He also had represented at least one debtor and one creditor in bankruptcy cases after going into private practice.

He acknowledged that Mr. DeLay and Mr. Stieren were his clients and discussed his billing and fee policies. Mr. Reid admitted that, when Mr. DeLay

-17-

filed his bankruptcy in August 2014, fees were owed to him for the state court litigation. He said that he received a $10,000 payment on those fees after the bankruptcy was filed, but he did not inquire as to the source of the funds for that payment, even though he knew of the bankruptcy filing.

Mr. Reid admitted that he learned of Mr. DeLay's bankruptcy when he received a notice of the filing addressed to Mr. Bandy "c/o David Reid." When he received that notice, he told his assistant to contact Mr. DeLay to get Mr. Bandy's address corrected. He admitted that he received three or four more notices through the mail addressed to Mr. Bandy at his office. Nevertheless, he said that he assumed the address problem had been fixed. Mr. Reid volunteered that he now wished he had taken more action on the issue.

Mr. Reid identified the letter he sent to Mr. DeLay and Mr. Stieren on August 28, 2014, notifying them of his intent to withdraw from representing them in the state court litigation. In the letter, he said that the bankruptcy filing "greatly affects" the state court case and explained that he knew that Mr. DeLay's legal actions became part of the bankruptcy. He testified that he was disappointed that Mr. DeLay filed bankruptcy without first talking with him about the impact the filing would have on the state court case. He was concerned that Attorney Hall and Mr. Bandy would use the bankruptcy as a "diversion." He also was concerned about the fact that he was owed fees by Mr. DeLay and Mr. Stieren.  Mr. Reid acknowledged that the letter also informed Mr. DeLay and Mr. Stieren that Mr. Bandy had offered $13,000 to settle the case and stated that he had no recollection of conveying that settlement offer to the Trustee. At the time, he believed the case was worth much more.

Mr. Reid also identified the email he received from Justine Guthrie assuring him that Mr. DeLay wanted to continue to pay his fees. Although he acknowledged that the email said nothing about the mailing matrix or the problem with Mr. Bandy's address, he assumed that the email supported his belief that the problem was fixed. He agreed that he did not respond to the email from Justine Guthrie to confirm that the address problem had been resolved. He also identified the response to the request to produce that he drafted on behalf of Mr. DeLay and Mr. Stieren. He admitted that he did not disclose the bankruptcy in response to Request No. 15 and said that, if he had to do it all over again, he would do it differently. He admitted that records related to Mr. DeLay's bankruptcy would not have been available at the Sangamon County Courthouse. He also admitted that he attended several hearings in the state court litigation and never used those occasions to tell Attorney Hall or the state court about the bankruptcy. Because he and Mr. Hall had trouble communicating, he tried to put everything in writing and avoided personal conversations with Mr. Hall. He asserted, however, that he had no reason to conceal the bankruptcy and believed that Mr. DeLay had corrected the address problem and Mr. Hall had received notice.

Mr. Reid admitted that he filed the motion to compel in the state court after the appellate court had ruled and that the motion sought no relief for the Trustee. He acknowledged that, at the time, the Trustee's motion to compromise had not yet been ruled on, and he did not ask for the Trustee's approval to go forward in state court when matters were pending in the bankruptcy court. He said that his course of action was a mistake and he now wished he had filed a motion seeking stay relief.

Mr. Reid also identified the email that he received from Mr. DeLay in September 2014 proposing settlement with Mr. Bandy. He agreed that the proposal in the email sought to cut the Trustee out of any recovery and that the email specifically said that Mr. Bandy "does not need to know" about the Trustee's involvement. He was unable to recall what response he made to the email and said that, because he was thinking of withdrawing at the time, he may not have acted on the email at all.

Under examination from his own attorney, Mr. Reid acknowledged that he has an understanding of automatic stay issues.  In Mr. DeLay's case, however, he did not realize there was a stay violation issue until August or September 2016 when he listened to the audio recording of the hearing on the Trustee's motion to compromise and heard this Court's comments. He also reiterated that, although he was initially aware of the problem with Mr. Bandy's notices being sent to him, he thought the problem had been taken care of and failed to notice that he was still getting the court notices for Mr. Bandy.

Randall Stieren was called as a witness by Mr. Bandy and said that he was disabled and not employed. He testified that the $10,000 he paid to Mr. Reid was obtained through loans from One Main Financial and from his bank in Farmersville. Mr. Stieren also testified about the history of RKR Clubs and said that he believed the business to be worth a significant amount of money. He complained that he and Mr. DeLay had been locked out of the business for seven years. In addition, Mr. Stieren acknowledged that he was aware that Mr. DeLay had filed bankruptcy, and he admitted that he signed the response to the request to produce that did not disclose the bankruptcy. He also said that he and Mr.

DeLay had recently sold their home, but he was vague about the financial details of the sale.

At the conclusion of Mr. Stieren's testimony, Mr. Bandy rested his case. Mr. DeLay declined to present any witnesses. Mr. Reid testified again on his own behalf.

Mr. Reid stated that he had no knowledge that Mr. DeLay was filing bankruptcy until after the petition was filed. He said that he never withdrew from representing Mr. DeLay and Mr. Stieren in the state court case despite threatening to do so. He continued his representation of them because he owed them some allegiance, he had accepted an additional payment for his fees, and he felt they had been wronged and had a meritorious case. He did not believe going forward in state court despite the bankruptcy was a problem until he heard the audio recording of the hearing on the Trustee's motion to compromise and learned of this Court's concerns. He realized at that time that he should have done more to get authority to proceed and stated that he meant no disrespect by his actions.

Mr. Reid admitted that, after the bankruptcy was brought to the state court's attention, he may have told the state court judge that the bankruptcy was "no big deal" but asserted that the comment was made before he heard this Court's concerns. Once he learned that this Court believed there may have been a stay violation and that there were other problems with the case having gone forward while the bankruptcy was pending, he took no further action in state court.

Under examination by Mr. Bandy's attorney, Mr. Reid admitted that it was Mr. Bandy's attorneys rather than himself who finally notified the state court of

the bankruptcy filing. He admitted that he knew there was a stay associated with Mr. DeLay's bankruptcy but said that he was not sure the state court action was stayed. He knew that Attorney Hall had requested to supplement the record in the appellate court, but the mandate issued anyway, so he just went ahead. He said he knows now that was a mistake.

Andrea Shaughnessy, Mr. Reid's assistant, was called as a witness on behalf of Mr. Reid. She testified that she had worked for Mr. Reid for 14 years and was his only employee. She said that, when mail is received, it is her job to open the mail, date stamp the contents, and attach the envelope to the back of the contents. In 2014, the bankruptcy notice regarding Mr. DeLay was received at their office through the mail, and she followed her standard procedures. She said that, when she gave the notice to Mr. Reid, he asked when Mr. DeLay had filed bankruptcy and told her to contact Mr. DeLay about correcting Mr. Bandy's address. On that same day, she spoke with Mr. DeLay and told him to get Mr. Bandy's address corrected on his bankruptcy documents.

Ms. Shaughnessy said that she heard back from Mr. DeLay within a week or so, and he told her that he had contacted his bankruptcy attorneys about the issue. She then told Mr. Reid that Mr. DeLay had made the request to fix the problem. She admitted that bankruptcy notices addressed to Mr. Bandy at their office address continued to be received in the mail, but she had no further discussions with Mr. Reid about the issue, and she thought nothing further about it herself. She also took no action to contact Ostling directly about the problem.

Justine Guthrie, a paralegal employee at Ostling, was also called as a

witness by Mr. Reid.[1] She testified that Ostling has its main office in Bloomington, Illinois, with several other offices around the state, including an office in Springfield, Illinois. Ms. Guthrie said that she was aware that Mr. DeLay hired Ostling to represent him in the filing of a Chapter 7 bankruptcy and that Thomas Carlisle was the staff attorney assigned to the case. She said that, although she had exchanged several emails with Mr. DeLay, she had no personal communications with him and never worked in the Springfield office.

Ms. Guthrie identified an intake form from Ostling's Springfield office showing that Mr. DeLay had a "walk-in" visit at that office on September 4, 2014. She said that, although her name was checked on the form as the person with whom Mr. DeLay spoke, she did not meet with him on that day. She said that Attorney Megan Ostling was the person who met with Mr. DeLay and that the handwritten information on the form regarding the meeting was written by Attorney Ostling. Ms. Guthrie said that she was instructed at some time after the meeting by Attorney Ostling to email Mr. Reid to let him know that Mr. DeLay was going to pay him notwithstanding the bankruptcy. She did not check the schedules at that time to see if Mr. Reid was actually listed as a creditor.

Ms. Guthrie said that she was not instructed to do anything regarding making any address corrections related to Mr. DeLay's bankruptcy documents. She noted that "David Hall" was written on the form but said that she would not have seen this actual form and that Attorney Ostling gave her no instructions

---

[1] Justine Guthrie testified that her name is now Justine Vega. Because Mr. DeLay and Mr. Reid referred to her as Justine Guthrie and that is the name found on relevant Ostling documents, she will continue to be referred to as Justine Guthrie despite her name change.

regarding Attorney Hall. Ms. Guthrie also said that it did not appear from their file that anyone working on Mr. DeLay's bankruptcy case in their office had searched state court records to determine who was representing the parties in the state court litigation disclosed by Mr. DeLay or to whom notices should be sent.

Under examination by Mr. Bandy's attorney, Ms. Guthrie confirmed that, prior to coming to court, she reviewed Ostling's records for any phone calls received from Mr. DeLay regarding Mr. Bandy's address. She said that the practice at Ostling is for recipients of client phone calls to email themselves after a call to create a record of the call. She found no record of any calls from Mr. DeLay.

At the conclusion of Ms. Guthrie's testimony, Mr. Reid rested. The Trustee then asked to testify again on her own behalf.

The Trustee said that she first became aware of the noticing problem with Mr. Bandy when she received Attorney Hall's phone call. Mr. Bandy later made her a $10,000 offer to purchase Mr. DeLay's interest in the business. But, when Mr. DeLay offered $15,000, she accepted it and filed her motion because she could pay all creditors in full. Under examination by Mr. Bandy's attorney, she denied that Mr. Bandy had offered her $30,000 before she filed her motion to compromise. She objected to being questioned about any additional offers from Mr. Bandy as she claimed that any such offers were part of settlement negotiations regarding this adversary proceeding. Her objection was sustained.

At the close of evidence, the parties presented argument and citation to authority. The matter is ready for decision.

-24-

## II. Jurisdiction

This Court has jurisdiction over the issues before it pursuant to 28 U.S.C. §1334. All bankruptcy cases and proceedings filed in the Central District of Illinois have been referred to the bankruptcy judges. CDIL-Bankr. LR 4.1; *see* 28 U.S.C. §157(a). Proceedings affecting the administration of the estate, the liquidation of the assets of the estate, and the adjustment of debtor-creditor relationships are core proceedings. *See* 28 U.S.C. §157(b)(2)(A), (O). This matter arises from the Debtor's bankruptcy itself and from the provisions of the Bankruptcy Code and may therefore be constitutionally decided by a bankruptcy judge. *See Stern v. Marshall*, 564 U.S. 462, 499 (2011).

## III. Legal Analysis

## A. Threshold Issues

A number of fundamental legal issues were raised in this case. The Defendants challenged well-settled law in their pleadings and arguments but, in large measure, failed to cite persuasive authority to support their positions. These threshold issues are, however, determinative of the outcome of the case and, accordingly, must be discussed in some detail.

### 1. Kent DeLay's Interest in RKR Clubs and his Rights Under the Purchase Agreement are Property of the Estate.

An estate is created upon the filing of a bankruptcy petition and the resulting commencement of a case. 11 U.S.C. §§301, 541(a). Property of an estate generally includes "all legal or equitable interests of the debtor in property as of

the commencement of the case." 11 U.S.C. §541(a)(1). "[E]very conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of §541." *Matter of Carousel Int'l Corp.*, 89 F.3d 359, 362 (7th Cir. 1996) (quoting *Matter of Yonikus (Yonikus II)*, 996 F.2d 866, 869 (7th Cir. 1993)).

When Mr. DeLay filed his bankruptcy, he had a contingent interest in RKR Clubs and rights under the Purchase Agreement. In the state court litigation, Mr. Bandy claimed that he was entitled to Mr. DeLay's membership interest in RKR Clubs and asked for a determination of the amount of money he owed Mr. DeLay to finalize the transaction set forth in the Purchase Agreement. Mr. DeLay counterclaimed that he was entitled to a return of his membership interest in RKR Clubs and asked the court to tell him how much he owed Mr. Bandy pursuant to the Purchase Agreement. Either way, Mr. DeLay had an interest in property related to RKR Clubs and the Purchase Agreement, and that property interest became property of his bankruptcy estate.

On his Schedule B, Mr. DeLay listed his interest as a liquidated debt and described it only as "Possible counter-sueing [sic] lawsuit ex-investor" with a value of "Unknown." This cryptic description told the Trustee little about Mr. DeLay's property interest and did not fully disclose what was involved in the pending state court litigation. And, unfortunately, it appears that the Trustee did not fully investigate what the litigation was about before telling Mr. Reid that he could proceed. On several interim reports to the UST, the Trustee reported that she was awaiting the outcome of the state court litigation and that she would proceed to collect something for the estate only if Mr. DeLay prevailed on his counterclaim. Thus, the Trustee seemed uninformed that Mr. DeLay would have a property

interest regardless of whether he won or lost on his counterclaim; the dispute was not whether he would receive anything from the litigation but rather whether he received his membership interest back or was entitled to additional payments from Mr. Bandy.

The Trustee could have and should have administered the asset when the case was filed rather than waiting for two years to find out how the state court would resolve the issues. When the bankruptcy was filed, the estate consisted of the same property as it does now—all of Mr. DeLay's interest in RKR Clubs and his rights under the Purchase Agreement. The fact that the extent of Mr. DeLay's rights in RKR Clubs and under the Purchase Agreement were disputed at the time of the bankruptcy filing did not prevent her from offering the property for sale. And, importantly, if she had contacted all parties to the litigation to see who might be interested in purchasing Mr. DeLay's interests and rights, she most likely would have discovered the problem with the notices to Mr. Bandy being sent to Mr. Reid's office and could have rectified that problem years ago.

Notwithstanding the Trustee's failure to promptly administer Mr. DeLay's property, his interest in RKR Clubs and his rights under the Purchase Agreement are still property of the estate. Mr. DeLay's property has never been abandoned, and all of his property remains property of this estate. None of the Defendants mounted any meaningful challenge on this issue. Understanding that whatever interests and rights Mr. DeLay had in RKR Clubs and under the Purchase Agreement were, at all relevant times, property of this estate is key to resolving many of the contested issues before the Court.

## 2. Ryan Bandy is a Creditor of Kent DeLay

The Defendants have argued that Mr. Bandy was not a creditor of Mr. DeLay when the bankruptcy was filed. The point of the argument is that, if Mr. Bandy were not a creditor, he would not be entitled to notice of the case filing and would not have standing to enforce the provisions of the automatic stay. The Defendants hoped to make all of Mr. Bandy's complaints go away based on their assertion that he was not a creditor at the time of the bankruptcy filing. Their arguments on this point are, however, not persuasive and not supported by authority.

The Code defines a creditor, in part, as an "entity that has a claim against the debtor that arose at the time of or before the order for relief[.]" 11 U.S.C. §101(10)(A). The term "claim" is defined, in part, as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured[.]" 11 U.S.C. §101(5)(A). A claim also includes a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment[.]" 11 U.S.C. §101(5)(B). In defining the term "claim," Congress intended to "adopt the broadest available definition[.]" *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991).

When he filed his bankruptcy, Mr. DeLay had already filed his counterclaim in the state court asking not only for the return of his membership interest in RKR Clubs but also for a determination of what he and Mr. Stieren owed Mr. Bandy. He asked for the same relief in subsequent filings, including his motion for summary judgment. All of his filings were signed by Mr. Reid. And, when the state court entered judgment on Mr. DeLay's motion for summary judgment, it

specifically found that Mr. DeLay owed money to Mr. Bandy to reimburse payments made on the note to Mr. Kuizin. It is therefore clear, based on Mr. DeLay's own statements in his state court filings, that Mr. Bandy had a claim against Mr. DeLay when he filed bankruptcy, even though the claim was disputed and unliquidated at the time. It is disingenuous for Mr. DeLay, Mr. Stieren, and Mr. Reid to ask this Court to find that Mr. Bandy did not meet the broad definition of creditor when they themselves filed documents with the state court evidencing their belief that Mr. Bandy was owed money by Mr. DeLay and Mr. Stieren. It is equally troubling for Mr. DeLay, Mr. Stieren, Mr. Reid, and the Trustee to ask this Court to uphold the state court judgment that, in part, orders Mr. DeLay and Mr. Stieren to repay amounts owed to Mr. Bandy while also asking this Court to find that Mr. Bandy was never a creditor of Mr. DeLay.

The Trustee's assertion that Mr. Bandy is not a creditor because the amounts owed to him by Mr. DeLay and Mr. Stieren do not have to be paid until Mr. Bandy returns their interests in RKR Clubs is also without merit. Unmatured rights to payment are specifically included in the statutory definition of a claim. 11 U.S.C. §101(5)(A).

Based on the Code's definition of a creditor, it is not a close call—Mr. Bandy was a creditor of Mr. DeLay when the bankruptcy was filed. Accordingly, Mr. Bandy was entitled to notice of the case filing and, as will be explained below, has standing to enforce the automatic stay.

### 3. Ryan Bandy Has Standing to Enforce the Automatic Stay.

All of the Defendants raised the issue of Mr. Bandy's standing to bring this

action in their answers and affirmative defenses. For the most part, they argued that, because Mr. Bandy was not a creditor, he has no standing. That issue has been dealt with above. But the Trustee also questioned whether Mr. Bandy suffered the type of particularized injury that would give him prudential standing to bring this action.

Standing is generally discussed in the context of either constitutional or prudential standing. A standing inquiry asks whether a party is entitled to have a federal court review the merits of the case presented. *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Standing in the constitutional sense is an element of the "case or controversy" requirements of Article III of the Constitution. *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 495 (7th Cir. 2005). To have constitutional standing, a litigant must show: (1) that he suffered an "injury-in-fact" that is concrete, particularized, and actual or imminent; (2) that the injury is fairly traceable to the defendant's conduct; and (3) that the injury is likely to be redressed by a favorable court decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Article III standing is a jurisdictional prerequisite to reaching the merits of a suit. *See Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009). A party whose standing is challenged has the burden of establishing standing by a preponderance of the evidence. *Perry v. Village of Arlington Heights*, 186 F.3d 826, 829 (7th Cir. 1999).

The concept of prudential standing is grounded not in Article III of the Constitution but in "matters of judicial self-governance" designed to guarantee that courts only resolve disputes that are appropriate for judicial resolution. *Warth*, 422 U.S. at 499-500. Prudential standing generally requires that parties

may not assert the rights of other persons or entities and must assert a claim that falls within the zone of interests protected by the specific law being invoked. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, __ U.S. __, 134 S. Ct. 1377, 1386, 188 L. Ed. 2d 392 (2014) (citing *Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 12 (2004)). Prudential limitations on standing are subject to waiver and to a court's discretion. *Korte v. Sebelius*, 735 F.3d 654, 668 (7th Cir. 2013). "Prudential limitations on standing are especially important in bankruptcy proceedings which often involve numerous parties who may seek to assert the rights of third parties for their own benefit." *In re Ampal-American Israel Corp.*, 502 B.R. 361, 369 (Bankr. S.D.N.Y. 2013) (citing *Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 644 (2d Cir. 1988)).

Mr. Bandy's constitutional standing has not been challenged. He has alleged concrete, particularized injuries suffered as a result of Mr. DeLay's conduct in and related to his bankruptcy case. Mr. Bandy also has sufficiently alleged that his injury can be redressed by a favorable decision from this Court. Rather, it is his prudential standing that is being questioned.

Mr. Bandy's standing is dependent on whether his interest falls within the zone of interests protected by the automatic stay. The zone-of-interests doctrine asks whether the party asserting the claim is within the particular class of persons that has a right to sue under the law invoked. *Lexmark*, 134 S. Ct. at 1387. The broadness of the zone-of-interest doctrine differs based on the law at issue. *Bennett v. Spear*, 520 U.S. 154, 163 (1997). Mr. Bandy seeks relief under §362(k) of the Code, which provides that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including

costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. §362(k).

The term "individual" in §362(k) refers to both debtors and non-debtors. *St. Paul Fire & Marine Ins. Co. v. Labuzan*, 579 F.3d 533, 539-43 (5th Cir. 2009). The automatic stay protects debtors from collection activities by creditors, and it protects creditors by preserving the estate and blocking efforts of other creditors from gaining an unfair advantage. *LaHood v. Covey (In re LaHood)*, 437 B.R. 330, 337 (C.D. Ill. 2010) (citations omitted); *Martino v. First Nat'l Bank of Harvey (Matter of Garofalo's Finer Foods, Inc.)*, 186 B.R. 414, 435 (N.D. Ill. 1995) (citations omitted). Because the automatic stay is meant, in part, to protect creditors, creditors are deemed individuals within the zone of interest of §362(k) and thus have standing to enforce its provisions. *St. Paul Fire*, 579 F.3d at 543; *Ampal-American*, 502 B.R. at 370; *In re Biesboer*, 2010 WL 2940927, at *6 (Bankr. N.D. Ill. July 27, 2010).

A creditor's standing to enforce the provisions of the automatic stay is not, however, without limitation. The enforcing creditor must assert an injury in his capacity as a creditor of the estate. *Lee v. McCardle (In re Peeples)*, 880 F.3d 1207, 1216 (10th Cir. 2018); *St. Paul Fire*, 579 F.3d at 545. And the creditor must assert his own direct injury and not a claim that any creditor could bring or a claim that belongs to the estate. *Ampal-American*, 502 B.R. at 371. If a claim could be asserted by any creditor, then that claim belongs to the estate, and only the trustee can bring the claim. *Id.*

Here, Mr. Bandy is asserting his own claim and an injury unique to him. He was not given notice of the filing of Mr. DeLay's bankruptcy and spent thousands

of dollars on state court proceedings after the state court had lost jurisdiction over Mr. DeLay's property that was the subject of their dispute. Mr. DeLay continued the state court action in violation of the automatic stay and without standing, all to the financial detriment of Mr. Bandy. The resulting injuries from Mr. DeLay's conduct were suffered by Mr. Bandy alone and could not be prosecuted by other creditors or on behalf of the estate.

The Trustee suggested in her closing argument that the assurance of the orderly liquidation of assets is the only purpose of the automatic stay that actually benefits creditors. She claims that, because Mr. Bandy is not seeking redress regarding that purpose, he should not be considered to have standing. But, in fact, that is exactly the purpose of Mr. Bandy's Adversary Complaint. The Trustee admits that she knew about and, in fact, acquiesced in Mr. DeLay's continuation of the state court proceedings; she did not enforce the stay, and she did not promptly administer Mr. DeLay's interest in RKR Clubs and his rights under the Purchase Agreement. As a result, this case is—for lack of better legal term—a mess. More than three years after the case filing, there has been no orderly liquidation of assets, and there cannot be any such orderly liquidation until the pending issues involving Mr. DeLay's wrongful conduct are resolved. Proper enforcement of the stay would have certainly avoided many of the problems here. Enforcement of the stay, albeit belatedly, is now compelled.

Mr. Bandy has both constitutional and prudential standing to seek redress of his grievances in this Court.

*4. Kent DeLay and Attorney David Reid Violated the Automatic Stay.*

The filing of a voluntary bankruptcy petition operates as an automatic stay. 11 U.S.C. §362(a). As stated above, the stay serves several purposes in bankruptcy cases; debtors are protected from creditor collection activities, and the estate is preserved for the benefit of creditors. *LaHood*, 437 B.R. at 337; *Martino*, 186 B.R. at 435. The stay is applicable to all entities, including the debtor. *McCord v. Sofer (In re Sofer)*, 507 B.R. 444, 449-50 (Bankr. E.D.N.Y. 2014) (citations omitted). The automatic stay is actually a "collection of stays" set forth in the various subsections of §362. *In re Sayeh*, 445 B.R. 19, 26 (Bankr. D. Mass. 2011). At issue here are two of those stays.

Section 362(a)(1) generally prohibits actions "against the debtor" and specifically stays "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor[.]" 11 U.S.C. §362(a)(1). As several of the Defendants have pointed out, the stay does not prohibit the continuation of actions that are not against the debtor but rather are being prosecuted by a debtor against another person or entity.

For purposes of determining the applicability of the automatic stay, a case may contain several actions or proceedings that must be considered separately. *Parker v. Bain*, 68 F.3d 1131, 1137 (9th Cir. 1995). "All proceedings in a single case are not lumped together for purposes of automatic stay analysis . . . . [S]ome actions may be stayed, others not." *Maritime Elec. Co. v. United Jersey Bank*, 959

-34-

F.2d 1194, 1204 (3d Cir. 1991). Claims, counterclaims, cross claims, and third-party claims must be "disaggregated" and dealt with separately for purposes of determining what proceedings are subject to the automatic stay. *Id.* at 1204-05; *see also In re Hall*, 304 F.3d 743, 746 (7th Cir. 2002); *In re Mid-City Parking, Inc.*, 332 B.R. 798, 806-07 (Bankr. N.D. Ill. 2005). Once disaggregated, if a claim is determined to not be "against the debtor" at its inception or is brought by the debtor, then the action is not stayed pursuant to §362(a)(1). *Mid-City*, 332 B.R. at 807.

Mr. DeLay and Mr. Reid both argued that their continued prosecution of Mr. DeLay's counterclaim brought with Mr. Stieren against Mr. Bandy did not violate the stay under §362(a)(1), and, on that limited point, they are correct. But the state court record shows that, after the bankruptcy filing, they did much more than simply prosecute the counterclaim. The motion for summary judgment filed on behalf of Mr. DeLay and Mr. Stieren sought complete relief as to all of the issues raised in both the State Court Complaint and the counterclaim notwithstanding the fact that there is no credible argument to be made that the original complaint brought by Mr. Bandy was not stayed. Further, Mr. DeLay responded to Mr. Bandy's motion for summary judgment that related to Mr. Bandy's claim rather than his counterclaim. The order obtained from the state court granted relief on the counterclaim and denied relief on the complaint, thereby resolving both the stayed and non-stayed portions of the case. The failure of Mr. DeLay and Mr. Reid to give notice of the bankruptcy to Mr. Bandy, Mr.

-35-

Bandy's attorney, and the state court facilitated the stay violation that occurred with the ongoing prosecution of Mr. Bandy's complaint. Mr. DeLay and Mr. Reid did not disaggregate the claims in the state court litigation to ensure that only the non-stayed actions continued. They proceeded with the state court litigation without any regard to what was stayed or not stayed and, in doing so, most certainly violated §362(a)(1).

Equally important, Mr. DeLay and Mr. Reid also violated the stay under §362(a)(3), which prohibits "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate[.]" 11 U.S.C. §362(a)(3). Notwithstanding the fact that Mr. DeLay's counterclaim was not stayed, Mr. DeLay himself was stayed from prosecuting that action. As set forth above, when Mr. DeLay filed his bankruptcy, all of his property, including his interest in RKR Clubs and his rights under the Purchase Agreement, became property of his bankruptcy estate. The Trustee was then charged with collecting all such property and reducing the property interests to money. 11 U.S.C. §704(a)(1). Unless and until a trustee abandons property, a trustee is the only party with authority to exercise control over estate property. *Michigan First Credit Union v. Smith (In re Smith)*, 501 B.R. 325, 326 (Bankr. E.D. Mich. 2013). Thus, the distinction between the §362(a)(1) stay and the §362(a)(3) stay must be made; although the counterclaim itself was not stayed, Mr. DeLay's prosecution of the action was stayed. *See In re Stinson*, 221 B.R. 726, 730-31 (Bankr. E.D. Mich. 1998). Because Mr. DeLay and Mr. Reid exercised control over property of the

estate without obtaining relief, they violated the stay under §362(a)(3). *See Smith,* 501 B.R. at 325-26; *Bailey v. Household Finance Corp. III (In re Bailey)*, 306 B.R. 391, 394 (Bankr. D.D.C. 2004); *Stinson,* 221 B.R. at 729-31.

In an effort to avoid this result, the Defendants rely on *Mid-City* and argue that a debtor or trustee may waive the protections of the automatic stay and proceed with otherwise stayed state court litigation without first seeking stay relief. *Mid-City* involved a Chapter 11 debtor-in-possession who filed a notice of appeal with respect to an adverse state court ruling despite the action in which the notice was filed being subject to a stay under §362(a)(1). *Mid-City,* 332 B.R. at 802. The *Mid-City* court found that the debtor-in-possession's conduct was not a stay violation because, under the circumstances presented, the debtor-in-possession had waived the protections of the stay. *Id.* at 820.

*Mid-City* is distinguishable from the matter before this Court. A debtor-in-possession under Chapter 11 may exercise many of the rights of a trustee and therefore retains control over the property of the estate. *Id.* at 809; 11 U.S.C. §1107(a). Thus, in *Mid-City*, the stay under §362(a)(3) was not violated because the debtor-in-possession properly exercised control over estate property. Further, and perhaps most importantly, *Mid-City* involved no issues regarding a lack of notice of the bankruptcy filing and the resulting stay to other parties; the other party in *Mid-City* knew of the bankruptcy and promptly filed a motion to dismiss the appeal due to the alleged stay violation. *Mid-City*, 332 B.R. at 802. Here, it is not disputed that neither Mr. Bandy nor his attorney knew of the bankruptcy filing.

-37-

And, although the Trustee admits that she told Mr. Reid to go ahead with the state court case and, in doing so, might be considered to have waived her right to enforce the stay as to Mr. DeLay, there was no evidence presented that the Trustee ever waived the stay as to Mr. Bandy. The Trustee did not communicate with Mr. Bandy or his attorney about the bankruptcy until after they discovered the bankruptcy from other sources and contacted her. *Mid-City*'s holding could only apply here if the Trustee had appeared in the state court case and continued to prosecute those proceedings on behalf of the estate. Then Mr. Bandy would have received notice of the bankruptcy filing and could have made his own judgment about how to proceed in light of the filing. This Court cannot and will not stretch the holding of *Mid-City* to find that the Trustee's decision not to enforce the stay as to Mr. DeLay constituted a full waiver of the stay as to Mr. Bandy and his State Court Complaint when he had no notice of the stay and received no explicit or implicit communication regarding the stay from the Trustee.

Additionally, it must be noted that *Mid-City* does not represent binding precedent for this Court, and *Mid-City* is somewhat of an outlier in its holding on the issue of waiver. *Mid-City* relied on a series of Tenth Circuit cases that the Tenth Circuit has since rejected. *See TW Telecom Holdings Inc. v. Carolina Internet Ltd.*, 661 F.3d 495, 497 (10th Cir. 2011). The better, majority view is that the automatic stay protects debtors, creditors, and property of the estate, and cannot be unilaterally waived. *In re Ace Track Co.*, 556 B.R. 887, 906 (Bankr. N.D. Ill. 2016).

The automatic stay applies to all entities and may be enforced, under appropriate circumstances, by debtors, creditors, and trustees. The wholly undisclosed agreement by the Trustee and Mr. Reid to allow Mr. Reid and Mr. DeLay to go forward in state court without notice to Mr. Bandy and without seeking relief from stay is not conduct this Court can condone. Mr. DeLay and Mr. Reid violated the automatic stay under both §362(a)(1) and §362(a)(3) by proceeding in state court after the bankruptcy filing without first obtaining relief.

### 5. Kent DeLay Had No Standing to Proceed in State Court

As set forth above, an estate consisting of all of Mr. DeLay's property was created when he filed his bankruptcy petition. 11 U.S.C. §541(a). Only the trustee has standing to exercise control over property of the bankruptcy estate unless and until the trustee abandons such property. *Smith*, 501 B.R. at 326; *Bailey*, 306 B.R. at 392. A debtor loses standing to pursue causes of action when they become estate property. *Bowen v. Peregrin (In re Peregrin)*, 2012 WL 5939266, at *3 (Bankr. N.D. Ill. Nov. 28, 2012).

At trial, the Defendants argued that standing could be retroactively granted to Mr. DeLay. Generally, standing must be determined at the commencement of the case. *Lujan*, 504 U.S. at 570 n.5; *Perry*, 186 F.3d at 830. Several bankruptcy cases have, however, acknowledged that standing may be retroactively conferred on a debtor if an asset is formally abandoned. *Morlan v. Universal Guaranty Life Ins. Co.*, 298 F.3d 609, 617 (7th Cir. 2002) ("[W]hen property of the bankrupt is

abandoned, the title reverts to the bankrupt, nunc pro tunc, so that he is treated as having owned it continuously.") (internal quotation marks omitted); *see also Matthews v. Potter*, 316 F. App'x 518, 521-22 (7th Cir. 2009) (holding that a debtor had standing all along once the claims were formally abandoned by the trustee); *Martin v. United States*, 2017 WL 59070, at *7 (C.D. Ill. Jan. 5, 2017) (holding that abandonment of the asset by the trustee had an "effect of reverting title" back to the debtor, which treated the debtor as having standing all along).

Here, however, the Trustee has not abandoned Mr. DeLay's interest in RKR Clubs or his rights in the Purchase Agreement. To the contrary, she now wants to administer these assets, and administration is appropriate because the competing offers to purchase Mr. DeLay's property are in amounts sufficient to pay all timely filed claims in full. Thus, the limited case law that could support Mr. DeLay obtaining retroactive standing is not applicable because any such standing would be expressly conditioned on abandonment, and abandonment is not contemplated here.

Rule 6009 provides that a trustee or, in a reorganization case, a debtor-in-possession has standing to prosecute or appear in cases on behalf of the estate.[2] Fed. R. Bankr. P. 6009. No comparable authority exists for a debtor in a Chapter 7 liquidation case to prosecute or defend actions on behalf of the estate prior to

---

[2] Even though authorized by Rule 6009 to proceed with litigation on behalf of the estate, the majority view is that a trustee may still need to seek stay relief to do so if the litigation involved is subject to the stay. *See Parker*, 68 F.3d at 1136; *In re Capgro Leasing Assocs.*, 169 B.R. 305, 313 (Bankr. E.D.N.Y. 1994).

abandonment and without court approval. Mr. DeLay had no standing to prosecute his state court counterclaim after filing his bankruptcy.

### 6. The State Court Lost Its Subject Matter Jurisdiction

The district courts have exclusive jurisdiction over all of a debtor's property as of the commencement of a case under title 11 and of property of the estate. 28 U.S.C. §1334(e)(1). The district courts "may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district." 28 U.S.C. §157(a). Bankruptcy judges may hear and decide all cases under title 11 and core proceedings that arise under title 11 or arise in a case under title 11. 28 U.S.C. §157(b)(1). Core proceedings include "proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor . . . relationship[.]" 28 U.S.C. §157(b)(2)(O). Personal injury tort and wrongful death cases are not core proceedings. *Id.*

When Mr. DeLay filed his bankruptcy, his interest in RKR Clubs and his rights under the Purchase Agreement became property of his bankruptcy estate subject to the exclusive jurisdiction of this Court by referral from the District Court. *See Stinson*, 221 B.R. at 730; CDIL-Bankr. LR 4.1. None of the Defendants dispute that. The Trustee asserted in her closing argument, however, that, if this Court had been asked, it most likely would have abstained from exercising jurisdiction over the matter. *See* 28 U.S.C. §1334(c). But mandatory abstention

is not at issue here, and no party ever asked this Court to permissibly abstain. Thus, it seems just as likely that, because the case involved contract interpretation and a determination of the nature and extent of the estate's interest in property, this Court might have declined to permissibly abstain had it been asked. Regardless, speculation about abstention is unnecessary. This Court has not abstained; to the contrary, it has retained exclusive jurisdiction over Mr. DeLay's property continually since his bankruptcy was filed. The state court lost subject matter jurisdiction over such property at the time of the bankruptcy filing and therefore had no jurisdiction to enter orders affecting Mr. DeLay's property. Mr. DeLay's attempt to deprive this Court of its jurisdiction over his property was ineffective and did not serve to vest jurisdiction in the state court. The state court lacked subject matter jurisdiction to enter summary judgment in favor of Mr. DeLay and against Mr. Bandy.

## B. The Adversary Complaint

Ryan Bandy's Adversary Complaint consisted of five counts. Count III sought relief against the Trustee related to her motion to compromise with Mr. DeLay and was dismissed for failure to state cause of action. Counts I, II, IV, and V were tried and are ready for decision.

### A. Count I

Count I of the Adversary Complaint alleges a willful violation of the

automatic stay by Mr. DeLay and seeks both compensatory and punitive damages. 11 U.S.C. §362(k)(1). For the reasons set forth above, it is clear that Mr. DeLay violated the automatic stay under both §362(a)(1) and §362(a)(3). 11 U.S.C. §362(a)(1), (3). After filing bankruptcy, Mr. DeLay prosecuted not only his counterclaim but also continued the litigation commenced by Mr. Bandy. And he took possession of the bankruptcy estate's interest in his property. To obtain damages for Mr. DeLay's wrongful conduct, Mr. Bandy was required to prove that Mr. DeLay's violation of the stay was willful. 11 U.S.C. §362(k)(1). Willfulness is established by proving a party knew of the bankruptcy filing and disregarded the resulting stay. *See In re Grason,* 2013 WL 3781766, at *6 (Bankr. C.D. Ill. July 18, 2013). The evidence presented at trial very clearly established that Mr. DeLay's stay violations were willful.

It is not disputed that Mr. DeLay scheduled Mr. Bandy at an address he knew was incorrect on his originally filed paperwork. At trial, he provided no credible explanation for why he listed Mr. Bandy's address on his bankruptcy schedules as Attorney Reid's office. He blames Ostling for the incorrect listing but offered no reason why Ostling would have gotten this information wrong unless he gave them wrong information in the first place. Mr. DeLay admits that he heard from Andrea Shaughnessy about the address problem and the need to get it fixed as soon as the first notices of his bankruptcy were sent. He said that he talked to Justine Guthrie twice on the phone and once at Ostling's Springfield office about fixing the address problem. But Ms. Guthrie denies ever speaking on the phone

with Mr. DeLay and says that she never works in the Springfield office and did not meet with Mr. DeLay there. Mr. DeLay's attorney did not cross-examine Ms. Guthrie on these matters; her testimony was credible and unrebutted.

Mr. DeLay says that when he went to Ostling's Springfield office, his purpose was to fix the problem with Mr. Bandy's address. But the intake sheet from that meeting contains no reference to Mr. Bandy or any mention of any address problems. Instead, the sheet has Mr. Reid's name and complete address listed as the information provided by Mr. DeLay, and the notes make reference to Mr. Reid's possible withdrawal. The undisputed result of the meeting at Ostling's Springfield office was that Ms. Guthrie was instructed by Attorney Ostling to contact Mr. Reid to assure him that his fees would be paid notwithstanding Mr. DeLay's bankruptcy. No changes to Mr. Bandy's address were made as a result of the meeting, and nothing on the intake sheet suggests that Mr. DeLay asked for any such changes. If he had, some information about the correct address for Mr. Bandy would, most certainly, have been on the sheet.   On September 3, 2014, just one day before his September 4th meeting in Ostling's Springfield office, Mr. DeLay emailed Mr. Reid regarding a settlement proposal he wanted Mr. Reid to make to Mr. Bandy. In that email, Mr. DeLay tells Mr. Reid that Mr. Bandy does not need to know that the pending state court case might be prosecuted by an attorney for the Trustee. This statement seriously undercuts Mr. DeLay's testimony that he was simultaneously making a concerted effort to correct his bankruptcy paperwork to ensure that Mr. Bandy would receive notice of the

bankruptcy filing. None of Mr. DeLay's testimony about his calls and visit with Ostling regarding correcting Mr. Bandy's address was credible.

Mr. DeLay also gave a false response to Request No. 15 of the request to produce served by Mr. Bandy in the state court litigation. In the response, he first said that the request regarding information on any action he might be involved in was irrelevant. That was clearly not true. As explained in detail above, a bankruptcy filing results in the imposition of the automatic stay, the loss of standing by a debtor to prosecute actions that have become property of the estate, and the potential loss of subject matter jurisdiction by a state court over a debtor's property. All of those consequences made Mr. DeLay's bankruptcy filing highly relevant to the pending state court litigation. Mr. DeLay also responded to Request No. 15 by stating that information about any action he was involved in could be found in the records at the Sangamon County Courthouse. That also was not true as information about his bankruptcy filing was not available at the county courthouse. Mr. DeLay offered no explanation or justification for making these false representations, which served to further deceive Mr. Bandy and the state court about his bankruptcy filing.

Mr. DeLay also failed to disclose to the Trustee that a $13,000 offer to settle had been made by Mr. Bandy around the time of the bankruptcy filing. Mr. DeLay knew of that offer because Mr. Reid informed him of it in a letter dated August 28, 2014. If the Trustee had been advised of the offer, she might have contacted Mr. Bandy or Mr. Hall and, in doing so, would have notified them of the bankruptcy

filing. Instead, Mr. DeLay took control of the pending state court case and prosecuted it to his own advantage and to the exclusion of the Trustee. In his email to Mr. Reid dated September 3, 2014, his intent to exclude the Trustee is clearly shown by his proposal that any settlement funds received be used to pay Mr. Reid first with any remainder to be distributed to Mr. Stieren alone.

At trial, Mr. DeLay appeared defiant and angry. He took no responsibility for the problems that have arisen in his case due to his lack of candor. When given an opportunity in closing arguments to suggest a remedy to address the trouble he had obviously caused, he declined to offer any suggestions. Stunningly, his attorney argued that Mr. Bandy was equally culpable for the problems here because, although Mr. DeLay wrongly assumed that the address problem regarding Mr. Bandy had been fixed—a claim he failed to prove—Mr. Bandy also wrongly assumed that there was no bankruptcy filing limiting his ability to proceed in state court. The argument is preposterous; Mr. Bandy had no duty to figure out on his own that Mr. DeLay was deceiving him, his attorney, and the state court. The argument did serve, however, to further undercut Mr. DeLay's credibility. He made no effort whatsoever to notify Mr. Bandy of his bankruptcy, and his testimony regarding his efforts was wholly unbelievable. His lack of candor about the bankruptcy filing facilitated his willful violation of the automatic stay. Mr. DeLay will be sanctioned with the imposition of both compensatory and punitive damages.

Compensatory damages include actual damages. 11 U. S. C. §362(k)(1). The

most obvious actual damage sustained by Mr. Bandy due to Mr. DeLay's willful violation of the stay is his loss of the opportunity to purchase, or at least bid on, Mr. DeLay's interest in RKR Clubs and rights under the Purchase Agreement at the inception of the bankruptcy case, before significant fees and costs were spent in the state court. That damage can be compensated by giving Mr. Bandy the opportunity now to meet Mr. DeLay's pending offer.

As compensatory damages, Mr. Bandy will be given an opportunity to purchase, for $15,000, Mr. DeLay's interest in RKR Clubs, rights under the Purchase Agreement, and all claims that were raised or that could have been raised in the counterclaim filed in state court. To accept this opportunity, Mr. Bandy must, however, agree to several conditions. The Trustee will be required to file and serve a notice of her intent to sell to Mr. Bandy. Mr. Bandy must be prepared to pay the $15,000 to the Trustee within 30 days of the Trustee obtaining a final order authorizing the sale. Additionally, Mr. Bandy must agree to subordinate his claim in this case to all other timely filed claims. This will allow the Trustee to use the sale proceeds to pay the other claims in full. The portion of Mr. Bandy's subordinated claim related to his payments on the note to James Kuizin will be allowed, and any amounts remaining on hand with the Trustee after the payment of other claims and administrative expenses will be distributed to Mr. Bandy to be applied to the portion of his claim related to the James Kuizin note. Should Mr. Bandy decline to subordinate his claim as required herein, the Trustee may reopen the bidding for Mr. DeLay's property and should seek approval of

-47-

appropriate sale procedures at that time.[3]

Attorneys fees and costs should also be awarded as compensatory damages for stay violations; indeed, the award of fees may be "mandatory." *In re International Forex of California, Inc.*, 247 B.R. 284, 291 (Bankr. S.D. Cal. 2000); 11 U.S.C. §362(k)(1). Mr. Bandy testified that he spent between $20,000 and $30,000 on fees in the state court litigation and has spent another $27,000 in litigating this case. In his proof of claim, he asked for $5221 in prepetition fees paid to Attorney Hall, $32,717 in postpetition fees paid to Attorney Hall, and $6000 in fees paid through March 2017 to his bankruptcy attorney, Kevin Linder. Unfortunately, Mr. Bandy failed to provide any itemization of the fee bills, making it difficult to determine the amount of fees he incurred as a result of the stay violation. The Purchase Agreement contains no fee-shifting provisions, and it is unclear why Mr. Bandy would be entitled to a claim against the bankruptcy estate or Mr. DeLay for his prepetition fees incurred before the stay violation. Likewise, his postpetition fees are not itemized, so no determination can be made of what

---

[3] Mr. Bandy should carefully consider his options before rejecting the Court's requirement that he subordinate his claim in order to be allowed to meet Mr. DeLay's bid. If he rejects that requirement, the bidding process will have to be reopened and others, including Mr. DeLay, will be allowed to bid. Mr. Bandy might still come out on top as the highest bidder, but any additional funds he pays to the Trustee might well be paid to Mr. DeLay as surplus funds rather than to Mr. Bandy as a further distribution on his claim. Most of Mr. Bandy's claim is for postpetition attorney fees that cannot be allowed as part of his claim. Because the bulk of his claim would certainly be disallowed, it is hard to see any benefit to him paying more money to purchase Mr. DeLay's assets. Best case, some of that additional  money is returned to him in payment of a portion of his claim; worst case, he loses the bidding and receives no more on his claim than he would have received if he had subordinated his claim in the first place.

fees were specifically incurred as a result of the stay violation and whether the amount of the fees incurred was reasonable.

What is clear is that Mr. Bandy was forced to incur fees to bring the stay violation to the Court's attention. He says he has paid Mr. Linder $27,000 for legal work in this case, but that lump sum amount presented without any itemization cannot be said to be reasonable; Mr. Linder made many missteps in this case, and, without a doubt, some of the time he spent was wasted. This Court can say, however, that $5000 would be, at a minimum, a reasonable amount to award as compensatory damages for attorney fees for bringing this action. That is the amount that will be awarded as compensatory damages in a money judgment to be entered in favor of Mr. Bandy and against Mr. DeLay. It is less than what Mr. Bandy requested and, most likely, much less than he is actually entitled to be awarded. But his case suffered from a lack of evidence on the issue of damages, and, for that reason, only the reduced amount will be awarded. Mr. Bandy will also be awarded his costs for the adversary filing fee; he presented no evidence as to any other costs incurred.

Mr. Bandy has also requested an award of punitive damages. Punitive damages may be awarded for stay violations under appropriate circumstances. 11 U.S.C. §362(k)(1). Punitive damages are intended to punish wrongful action that was intentional or malicious and to deter the wrongdoer or others from similar conduct. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 266-67 (1981). Here, Mr. DeLay's conduct was intentional and of the type that justifies an award of

punitive damages. He listed Mr. Bandy incorrectly on his schedules and then, despite a request from Mr. Reid's office, failed to correct the problem. His testimony that he made calls and a visit to Ostling's office to correct the problem was not credible and was soundly rebutted by the testimony of Justine Guthrie. His intent to deceive Mr. Bandy about the bankruptcy filing was boldly admitted in his email of September 3, 2014, to Mr. Reid. Mr. DeLay's deception facilitated his violation of the stay by the continuation of the state court proceedings. This is the exact type of wrongdoing that must be deterred.

Punitive damages should be awarded in an amount "sufficient to insure that it will punish and deter." *Sansone v. Walsworth (In re Sansone)*, 99 B.R. 981, 989 (Bankr. C.D. Cal. 1989) (internal quotation marks omitted). A punitive damage award should "sting the pocketbook of the wrongdoer." *Id.* At the same time, in considering an award of punitive damages, a variety of other factors should be considered, including the nature and extent of the harm caused, the ability of the wrongdoer to pay, and the level of sophistication of the wrongdoer. *Baggs v. McClain Ford-Mercury, Inc. (In re Baggs)*, 283 B.R. 726, 729 (Bankr. C.D. Ill. 2002) (Perkins, J.) (citations omitted).

Mr. DeLay made no claim that he was unsophisticated or that he did not understand the directions given to him when Mr. Reid's assistant told him to get the problem with Mr. Bandy's address fixed. To the contrary, his email to Mr. Reid on September 3, 2014, evidences a well-developed plan to keep Mr. Bandy in the dark while also cutting the Trustee out of any settlement proceeds. The harm here

is serious. Although Mr. Bandy did not itemize his expenditures for attorney fees in a way that more compensatory damages could be awarded, there is no doubt that significant amounts were spent needlessly because of Mr. DeLay's wrongful conduct. Further, significant resources of both the state trial and appellate courts were expended long after both courts had lost subject matter jurisdiction over Mr. DeLay's property.

Mr. DeLay has $15,000 on deposit with the Trustee. The Court has no knowledge of any other assets he may have. The Court will award Mr. Bandy an additional $10,000 money judgment against Mr. DeLay for punitive damages. The Court will also order Mr. DeLay to facilitate the turnover of the funds he has on deposit with the Trustee to Mr. Bandy in payment of the money judgments entered for compensatory and punitive damages. Mr. DeLay's compliance with this order will result in the payment of both money judgments and leave him with only the costs to pay from other funds.

### B. Count II

Count II seeks a declaratory judgment that the summary judgment entered by the state court is void. Count II seeks relief as to both Mr. DeLay and Mr. Stieren, claiming that Mr. DeLay's wrongful conduct so tainted the state court process that the entire summary judgment must be voided. No relief was initially sought against the Trustee in Count II, but she was allowed to intervene based on her assertion that she had an interest in preserving the state court summary

judgment for the benefit of the bankruptcy estate.

"Actions taken in violation of an automatic stay ordinarily are void." *Middle Tenn. News Co. v. Charnel of Cincinnati, Inc.,* 250 F.3d 1077, 1082 (7th Cir. 2001) (citing *Matthews v. Rosene*, 739 F.2d 249, 251 (7th Cir. 1984)). Here, the problems caused by the stay violation are compounded by the lack of standing of Mr. DeLay and the loss of subject matter jurisdiction by the state court. A judgment entered in violation of the stay by a court without subject matter jurisdiction in favor of a party without standing simply cannot stand. As to Mr. DeLay, there is no option other than to declare the summary judgment entered in his favor to be void.

The same result is not compelled with respect to Mr. Stieren. His prior ownership interest in RKR Clubs was separate and distinct from Mr. DeLay's interest in RKR Clubs. The fact that they entered into a joint Purchase Agreement did not result in their interests being combined. No evidence to the contrary—or any evidence at all on the issue—was presented at trial. The filing of Mr. DeLay's bankruptcy did not result in Mr. Stieren's separate property becoming property of the estate, and, accordingly, the state court did not lose subject matter jurisdiction over Mr. Stieren's property. The automatic stay stayed the state court action only as to Mr. DeLay's property and not as to the property and rights of his non-debtor co-defendant, Mr. Stieren. *In re Richard B. Vance and Co.*, 289 B.R. 692, 696-97 (Bankr. C.D. Ill. 2003) (Perkins, J.). The portion of the summary judgment entered in favor of Mr. Stieren and against Mr. Bandy cannot be avoided by this Court as no factual or legal basis to do so was presented.

The Trustee intervened as to Count II. Although she presented no evidence on the issues raised by Count II, at the close of trial, she argued that the summary judgment entered in favor of Mr. DeLay should not be declared void. The Trustee admitted that the stay had been violated and that the state court had lost subject matter jurisdiction before the summary judgment was entered. Nevertheless, she argued that this Court should annul the stay and retroactively abstain as to the state court proceedings, even though no motion was filed by any party seeking such relief.

Annulment of an automatic stay is one of the permitted forms of stay relief. 11 U.S.C. §362(d). But annulment is a remedy generally requested only after there has been a stay violation, and the decision to grant an annulment is within the sound discretion of a court. *In re Pleasant*, 320 B.R. 889, 894 (Bankr. N.D. Ill. 2004). Two important factors in considering whether to grant an annulment are whether the stay violation was willful and whether the movant would be unfairly prejudiced by denial of the motion and continuation of the stay. *Will v. Ford Motor Credit Corp. (In re Will)*, 303 B.R. 357, 368 (Bankr. N.D. Ill. 2003). Here, as set forth above, the stay violation was not only willful but so egregious that an award of punitive damages was warranted. And, although there is no motion for stay relief pending and technically no movant seeking such relief, no evidence of prejudice to the Trustee was established. The Trustee seems to think that she has nothing to sell if the summary judgment is declared void. But that is not true. Mr. DeLay's interest in RKR Clubs and his rights under the Purchase Agreement

remain property of the estate and can be sold.

The Trustee has cited no authority in support of the proposition that this Court can or should retroactively abstain. As set forth above, it is not at all clear that this Court would have permissibly abstained if timely requested to do so. Permissibly abstaining now for the sole purpose of conferring legitimacy on Mr. DeLay's wrongful conduct would set a worrisome precedent. All parties here must bear the consequences of their actions. The relief requested by the Trustee must be denied. The judgment that will be entered declaring the summary judgment void will bind the Trustee.

## C. Counts IV and V

Counts IV and V allege that Attorney David Reid willfully violated the automatic stay by his continuation of the state court proceedings after Mr. DeLay's bankruptcy filing and seek awards of compensatory and punitive damages. As set forth above, there is no question that Mr. Reid violated the stay in continuing with the state court case. There also can be no finding other than that his violation was willful; he knew of the bankruptcy and the existence of the automatic stay but proceeded without seeking stay relief.

In seeking damages, Mr. Bandy points to Mr. Reid's direct involvement in Mr. DeLay's nondisclosure of the bankruptcy filing to Mr. Bandy, Attorney Hall, and the state court. Mr. Reid received Mr. Bandy's notices at his office and never forwarded any of those notices to Mr. Bandy or Mr. Hall. Mr. Reid did tell his

assistant to contact Mr. DeLay about the address problem, but even after Mr. DeLay said he fixed the problem, Mr. Reid continued to receive the notices. And on September 3, 2014, Mr. Reid received an email from Mr. DeLay expressly proposing to take advantage of Mr. Bandy's lack of knowledge of the bankruptcy during their settlement discussions. Mr. Reid had ample warning signs that Mr. DeLay had never fixed the problem with Mr. Bandy's address on his bankruptcy schedules.

Mr. Reid also failed to disclose the bankruptcy to the state court. There can be no doubt that Mr. DeLay's bankruptcy filing was relevant to the state court case. As a result of the filing, an automatic stay came into existence that prohibited the continuation of the action commenced by Mr. Bandy, Mr. DeLay lost standing to prosecute his counterclaim, and the state court lost subject matter jurisdiction over Mr. DeLay's property. In addition to not making a timely and voluntary disclosure of the bankruptcy, Mr. Reid participated with Mr. DeLay and Mr. Stieren in providing a false answer to a request to produce where an accurate answer would have disclosed the bankruptcy. When asked at Request No. 15 for copies of documents related to any actions to which Mr. DeLay or Mr. Stieren was a party, Mr. Reid provided a response stating that any such requested information was irrelevant but, to the extent it existed, was available at the Sangamon County Courthouse. Both parts of that answer were false. The bankruptcy information was not irrelevant, and it would not have been found by a search of the records at the Sangamon County Courthouse.

In his request for punitive damages, Mr. Bandy pointed out that Mr. Reid's conduct in failing to disclose Mr. DeLay's bankruptcy to Mr. Bandy, Mr. Hall, and the state court appears to have violated the Illinois Rules of Professional Conduct. Illinois lawyers may not knowingly "fail to disclose" to a court "legal authority . . . known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel[.]" Ill. R. Prof'l Conduct (2010) R. 3.3. This Rule would seem to have compelled Mr. Reid's disclosure to the state court of the bankruptcy filing. Mr. DeLay's bankruptcy filing had legal implications arising from well-settled law that were adverse to Mr. DeLay, and it was not disclosed by Attorney Hall because Attorney Hall did not know about the bankruptcy. Mr. Reid said he was concerned that Mr. Bandy and Attorney Hall might use the bankruptcy filing as a diversion, but that is no excuse for the failure to disclose the bankruptcy to the state court.

Illinois lawyers also may not "unlawfully obstruct another party's access to evidence or unlawfully . . . conceal a document or other material having potential evidentiary value." Ill. R. Prof'l Conduct (2010) R. 3.4(a). Mr. Reid's failure to turn over the mail he received for Mr. Bandy either to Mr. Bandy or to Attorney Hall appears to violate this Rule. Mr. Reid offered no excuse at trial for keeping the bankruptcy documents and not delivering them to the rightful recipient. The bankruptcy notices certainly had potential evidentiary value related to the several legal issues raised by the bankruptcy filing, including the automatic stay, standing, and subject matter jurisdiction.

Mr. Bandy also argued that Mr. Reid's role in drafting the false response to Request No. 15 of his request to produce violated both the Illinois Rules of Professional Conduct and the Illinois Supreme Court Rules. Illinois lawyers may not "fail to make reasonably diligent effort to comply with a legally proper discovery request by an opposing party[.]" Ill. R. Prof'l Conduct (2010) R. 3.4(d). Further, Mr. Reid' signature on the response constituted a "certificate by him" that not only had he read the response but also that "to the best of his knowledge, information and belief formed after reasonable inquiry" the response was "well grounded in fact" and was "warranted by existing law[.]" Ill. Sup. Ct. R. 137. At trial, Mr. Reid's testimony about the faulty response was simply that nothing about Request No. 15 triggered him to think about the bankruptcy filing. Mr. Reid's duty, however, was to make a diligent effort and a reasonable inquiry into the facts and the law before responding to the discovery request. The response to Request No. 15 does not evidence compliance with such duties.

The Trustee admits that she told Mr. Reid to go ahead with the state court litigation. She also admits that she was mistaken in doing so as she had not thought through the issues of the automatic stay, standing, and subject matter jurisdiction. Mr. Reid relied on the Trustee because he knew that she had been a bankruptcy practitioner for over 30 years, and he expected that the advice he was receiving from her was solid. There is no doubt that Mr. Reid was initially led astray by the Trustee's bad advice. But the Trustee did not know that Mr. Bandy had not received notice of the bankruptcy, and she played no role in Mr. Reid's

failure to disclose the bankruptcy to the state court. Even with her bad advice to go forward, the problems being addressed now could have been avoided if Mr. Reid had forwarded Mr. Bandy's mail to him and made proper disclosure of the bankruptcy to the state court. If Mr. Bandy had received timely notice of the bankruptcy, he might have taken a variety of different actions or taken no action at all. But he could not be before this Court now complaining about the lack of notice. It was the lack of notice that facilitated Mr. DeLay's and Mr. Reid's violations of the stay, and it is the lack of notice that justifies an award of damages.

Mr. Bandy presented limited evidence as to his actual damages. The award made in his favor and against Mr. DeLay compensates him for all of his established actual damages. Mr. Reid's attorney argued at the close of trial that Mr. Reid has been punished through the public nature of these proceedings and that no award of punitive damages was required to deter similar conduct by Mr. Reid or other attorneys in the future. In large measure, this Court agrees. Mr. Reid has had a long, exemplary career and is highly respected in the local legal community. His lapse in judgment documented herein was, without question, an isolated incident. He has taken responsibility for his conduct and apologized for his mistakes. Accordingly, although this Court's findings that Mr. Reid willfully violated the automatic stay will stand, no additional award of compensatory or punitive damages will be entered in favor of Mr. Bandy.

## IV. Conclusion

The Court takes no pleasure in publicly criticizing the Trustee or Attorney Reid. Both are respected practitioners; their mistakes detailed herein represent isolated incidents of poor judgment. The Trustee and Attorney Reid have admitted their mistakes and apologized. But the mistakes were serious, caused real damage to Mr. Bandy, and cannot be ignored.

The sanctioning of Mr. DeLay is also an unpleasant task. But Mr. DeLay chose to file bankruptcy while he had complicated litigation pending in the state court without even consulting the attorney representing him in that matter. He made the decision not to properly notify Mr. Bandy of the bankruptcy filing and then tried to leverage that lack of notice for his own personal benefit and to the exclusion of the Trustee. His conduct was egregious, and a strong message must be sent to deter him and others from thinking they can get away with this type of conduct. Mr. DeLay ends up with a really unfortunate result here, but the result is compelled by his bad choices and by his refusal to take responsibility for his actions.

Nothing in this Opinion should be construed as criticism of the state trial or appellate courts. Those courts had no knowledge of the bankruptcy, the imposition of the automatic stay, Mr. DeLay's loss of standing, or their loss of subject matter jurisdiction. State courts have an expectation that attorneys or parties will alert them to such matters; those expectations were not met here. This decision is not a review of the state court decisions. The fact that a judgment will

be entered here that voids, in part, the summary judgment entered by the state court is the result of the imposition of sanctions rather than the product of a review of the merits of the underlying case.

In the overall administration of Chapter 7 bankruptcy cases, it is the trustees "who should be the experts in the procedures required" to collect and sell assets and settle causes of action. *In re Trahan*, 460 B.R. 207, 213 (Bankr. C.D. Ill. 2011). The case trustee should be the one demanding that all other parties follow required procedures and not cut corners. *Id.* Here, that fundamental principle was not followed, and, as a result, the parties have engaged in lengthy and acrimonious litigation at significant expense to all involved. This case should provide a cautionary tale for all bankruptcy practitioners. Following the mandates of the Code and Rules is not optional.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

###